### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

RYAN SHECKLES,

                  Petitioner,

                  v.                         No. 3:22 CV 236

WARDEN,

                  Respondent.

## OPINION and ORDER

Ryan Sheckles, a prisoner without a lawyer, filed a habeas corpus petition challenging his 2011 murder conviction in Clark County under case number 10C01-1007-MR-600. (DE # 2.) For the reasons stated below, the petition is denied.

## I.      BACKGROUND

On direct appeal, the Indiana Court of Appeals set forth the facts underlying Sheckles' conviction as follows:

> On August 25, 2009, Robert Sheckles, Sheckles's cousin, called his girlfriend, Laisha Smith, and asked if she could drive him and Sheckles so that Sheckles could sell drugs. Smith had done this many times before and would drive the pair to different places, and Sheckles and Robert would deal cocaine to various clients. Sheckles and Robert would reimburse Smith by paying for fuel and giving her $40 to spend on painkillers, which she had been addicted to after having three surgeries her junior year in high school.
>
> At about 8:00 p.m. on August 25, Smith picked up Sheckles and Robert at the Evergreen Apartments in Clarksville in her father's dark green Ford pickup truck. Sheckles sat beside Smith in the front passenger seat, while Robert sat in the middle of the backseat. They stopped at Robert Farming's home, where Sheckles either sold him cocaine or marijuana. Eventually, Sheckles directed Smith to drive to another place in

Jeffersonville, where she had never been before. As they drove, Sheckles received several calls from Larry Morrow, who was using his ex-wife's, Shannon Morrow's, cell phone.

Following Sheckles's instructions, Smith stopped the vehicle, and as soon as she put the vehicle in park, Larry ran to the side of the truck where Sheckles was sitting in the front passenger seat. Larry asked why it took so long for them to arrive. Smith pulled out her cell phone to check her text messages. Sheckles and Larry began arguing about how much money Larry had and how much cocaine Sheckles would give him. Shannon approached as the two of them argued. At some point Larry placed money in Sheckles's lap. The argument escalated and Sheckles pulled a gun from his waistband and shot Larry in the face, killing him. Sheckles then shot Shannon as she turned and fled. . . .

Sheckles and Robert told Smith to drive, and she put the truck in gear and drove. Smith ran over Larry as she pulled away. When Smith stopped at an intersection, Sheckles put his gun out the window and shot up into the air, yelling a gang slogan. Sheckles remarked that if he had not killed Shannon right there, he would have to find a way into the hospital to kill her so that she could not be a witness to what had happened. Sheckles told Smith to keep driving, but before they went far, Robert told Smith to pull over and let him out, which she did. Robert fled between two houses, and Sheckles told Smith to drive to Louisville. . . .

Smith drove Sheckles to a McDonald's restaurant in Louisville where he stepped out of the truck and began looking for casings. Sheckles received a phone call from Robert, and Sheckles told Smith to drive back to Jeffersonville to pick up Robert. After picking up Robert, Smith drove back to Louisville to pick up Sheckles. Sheckles stated that he had disposed of the gun in a dumpster and had Smith drive them to a Motel 6 in Louisville.

When they arrived at the motel, two of Sheckles's and Robert's friends were there trying to obtain a room. After they checked in, the five of them went up to the room. Smith was in the back bedroom area of the suite talking to Robert about what had happened. Sheckles joined them and told Smith not to say anything about what happened because, "we don't want anything like this to happen to you." Smith promised not to say anything. Smith left to go home as her father needed his truck for work.

The next day, Smith drove Sheckles and Robert to [Robert] Farming's home and dropped off some gun clips. Robert gave Farming the gun clips

to hide in exchange for some marijuana. Sheckles and Robert also wanted Smith to go to Tennessee to change the tires on her father's truck. Sheckles thought that Smith might have run over Larry's foot, leaving evidence on the tires. . . .

On August 30, 2009, Smith was incarcerated for an unrelated offense for approximately three and one-half months. . . . Smith had a conversation with Sheckles following her release during which he asked how she was doing and for her telephone number. Later, Smith encountered Sheckles in jail when she visited a friend, and Sheckles told her that law enforcement had questioned him about the Morrow murders and that he knew how to talk to law enforcement officers so that they would not think one of them was involved. Sheckles advised Smith that, if questioned by law enforcement, she should say nothing and act like she did not know what the officers were talking about.

Several police officers questioned Sheckles after tracing Larry's last phone calls made on Shannon's phone to Megan Tomlinson who led them to Sheckles. Eventually, an anonymous tip led law enforcement officers to Smith in July 2010. . . . Smith's statement led police officers to investigate Sheckles and Robert as suspects. Investigators discovered a corner of a plastic baggie at the crime scene that led them to suspect that drugs were involved in the killings because such corners are used to package illegal drugs. Eventually, after obtaining DNA samples from the victims and suspects, investigators were able to identify Sheckles's DNA as the major contributor in a mixed DNA profile discovered on a Newport cigarette—Sheckles's favored brand—found at the scene.

*Sheckles v. State*, 968 N.E.2d 870 (Table), 2012 WL 1933082, at *1-3 (Ind. Ct. App. May 29, 2012) (internal citations omitted). Sheckles was subsequently charged with two counts of murder, as Shannon Morrow had died from her injuries a few weeks after being shot. *Id.* at *3. He was convicted by a jury and sentenced to an aggregate prison term of 120 years. *Id.* at *5.

On direct appeal, he raised the following claims: (1) the evidence was insufficient to support his conviction; (2) the trial court erred in connection with a jury instruction on accomplice liability; (3) the prosecutor committed misconduct in his comments

during closing argument; (4) the trial court erred in allowing certain testimony from Shannon Morrow's father; (5) he was denied a fair trial because of the conduct of his cousin, Robert, who was called as a witness by the prosecution but subsequently refused to testify; (6) the trial court erred in refusing to permit his attorney to impeach Laisha Smith about a prior arrest; and (7) his sentence was unduly harsh. *Sheckles v. State*, 968 N.2d 870 (Table), 2012 WL 1933082, at \*6-13 (Ind. Ct. App. May 29, 2012).

The court rejected each of these arguments. The court found the evidence sufficient based on Smith's testimony and the DNA evidence found at the scene. *Id.* at \*6-7. The court further concluded that the accomplice liability instructions were proper under Indiana law. *Id.* at \*8. The court also concluded that Sheckles had waived his claims of prosecutorial misconduct by failing to object at trial, and that notwithstanding the waiver, the prosecutor's comments did not deprive him of a fair trial. *Id.* at \*9-10. The court also found no error in the admission of the challenged testimony from Shannon's father or in the court's handling of Robert as a recalcitrant witness. *Id.* at 11. The court concluded that the trial court properly excluded evidence about Smith's prior arrest, because it had not resulted in a conviction. *Id.* The court alternatively concluded that any error in excluding this evidence was harmless, because Sheckles' attorney was able to impeach Smith with evidence of a prior shoplifting conviction and charges pending against her for battery and possession of a controlled substance. *Id.* at \*12. Finally, the court found his sentence appropriate and affirmed in all respects. *Id.* at \*13-14.

He then filed a petition to transfer to the Indiana Supreme Court, asserting only the following claims: (1) the jury was not properly instructed on accomplice liability and (2) the prosecutor committed misconduct during closing arguments. (DE # 10-10.) The Indiana Supreme Court denied his petition to transfer without comment. *Sheckles v. State*, 979 N.E.2d 632 (Table) (Ind. 2012).

In 2013, he filed a pro se petition for post-conviction relief, which was later amended after an attorney filed an appearance on his behalf. *Sheckles v. State*, 171 N.E.3d 1044 (Table), 2021 WL 2280972, at *3 (Ind. Ct. App. June 4, 2021). An evidentiary hearing was held, at which his two trial attorneys, Jennifer Culotta and Amber Shaw, both testified. *Id.* His post-conviction attorney also introduced various documents into evidence. *Id.* Following the hearing, the petition was denied. *Id.*

On appeal, Sheckles proceeded without counsel and raised several claims of ineffective assistance by trial counsel. Specifically, he argued that his trial attorneys were ineffective in: (1) failing to investigate Jeffersonville Police Detective Shawn Kennedy, who was involved in the investigation and later resigned over allegations of workplace misconduct; (2) failing to request an admonishment or move for a mistrial after his cousin Robert had an outburst on the witness stand; (3) agreeing to the additional instruction on accomplice liability and otherwise failing to ensure the jury was properly instructed that his mere presence at the scene was not enough to convict; and (4) failing to object to comments made by the prosecutor during closing argument. *Id.* at *3-7. Based on his trial attorneys' testimony at the post-conviction hearing and the

resolution of certain issues on direct appeal, the court found that his attorneys' performance did not violate the Sixth Amendment. *Id.*

He then filed a pro se petition to transfer to the Indiana Supreme Court raising only two claims of ineffective assistance of counsel: (1) his trial attorneys were ineffective in failing to "investigate and challenge the information obtained from disgraced Detective Shawn Kennedy" and (2) his trial attorneys were ineffective in failing to object to comments made by the prosecutor during closing arguments. (DE # 10-17 at 2.) The Indiana Supreme Court denied transfer without comment. *Sheckles v. State*, 172 N.E.3d 272 (Ind. 2021).

He then filed his federal petition asserting five claims. He first claims his trial attorneys were ineffective in the following ways: (a) failing to investigate and exclude evidence relating to Detective Kennedy; (b) failing to object to prosecutorial misconduct during closing arguments; (c) failing to object to the accomplice liability instructions; and (d) failing to move for a mistrial after Robert's outburst. In claim two, he asserts that the Indiana Court of Appeals rendered a decision contrary to *Sandstrom v. Montana*, 442 U.S. 510 (1979), in rejecting his claim relating to the accomplice liability instructions. In claim three, he argues that the Indiana Court of Appeals rendered a decision contrary to *Illinois v. Allen*, 397 U.S. 337 (1979), in rejecting his claim related to Robert's outburst. In claim four, he argues that the Indiana Court of Appeals rendered a decision contrary to *Chambers v. Mississippi*, 410 U.S. 284 (1973), when it rejected his claim that he should have been permitted to cross-examine Smith about her prior arrest. Finally, in claim five, he argues that the Indiana Court of Appeals rendered a decision contrary to *United*

*States v. Young*, 470 U.S. 1 (1985), when it rejected his prosecutorial misconduct claim.[1]

(DE # 2.) The respondent argues that these claims are either procedurally defaulted or

fail on the merits under governing standards. (DE # 10.) Sheckles has filed a traverse

responding to these arguments. (DE # 27.) The matter is now ripe for adjudication.

## II.    ANALYSIS

The petition is governed by the provisions of the Anti-Terrorism and Effective

Death Penalty Act of 1996 ("AEDPA"), which allows a court to issue a writ of habeas

corpus "only on the ground that [the petitioner] is in custody in violation of the

Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Habeas corpus

was intended as a "guard against extreme malfunctions in the state criminal justice

systems, not a substitute for ordinary error correction through appeal." *Gilbreath v.*

*Winkleski*, 21 F.4th 965, 981 (7th Cir. 2021) (citation and quotation marks omitted). The

court can grant an application for habeas relief if it meets the stringent requirements of

28 U.S.C. § 2254(d), set forth as follows:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or

---

[1] He asserts a sixth claim that "there is cause and prejudice to excuse any default issues pursuant to *Martinez*, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272; *Trevino*, 133 S. Ct. 1911, 185 L. Ed. 2d 1044." (DE # 2 at 20.) This is not a substantive constitutional claim, and instead the court understands him to be arguing that any defaulted claim should be considered on the merits. The court considers this argument where applicable in analyzing his substantive claims.

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This standard is "difficult to meet" and "highly deferential." *Hoglund v. Neal*, 959 F.3d 819, 832 (7th Cir. 2020) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). "It is not enough for a petitioner to show the state court's application of federal law was incorrect; rather, he must show the application was unreasonable, which is a 'substantially higher threshold.'" *Hoglund*, 959 F.3d at 832 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). To prevail, "[a] petitioner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

A.    *Ineffective Assistance of Counsel*

Claims 1(a)-(d) all center on the performance of the attorneys who represented him at trial, Culotta and Shaw. Under the Sixth Amendment, a criminal defendant is entitled to "effective assistance of counsel—that is, representation that does not fall below an objective standard of reasonableness in light of prevailing professional norms." *Bobby v. Van Hook*, 558 U.S. 4, 16 (2009). To prevail on a claim of ineffective assistance, the petitioner must show that counsel's performance was deficient and that the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

On the deficiency prong, the central question is "whether an attorney's representation amounted to incompetence under prevailing professional norms, not

whether it deviated from best practices[.]" *Harrington v. Richter*, 562 U.S. 86, 105 (2011). The petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Gilbreath*, 21 F.4th at 981. The court's review of counsel's performance is deferential, and there is an added layer of deference when the claim is raised in a federal habeas proceeding: "[T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

Furthermore, the court should "evaluate [counsel's] performance as a whole," *Ebert v. Gaetz*, 610 F.3d 404, 412 (7th Cir. 2010), and must respect its "limited role in determining whether there was manifest deficiency in light of information then available to counsel." *Premo v. Moore*, 562 U.S. 115, 125 (2011). An attorney's representation "need not be perfect, indeed not even very good, to be constitutionally adequate." *Delatorre v. United States*, 847 F.3d 837, 845 (7th Cir. 2017). Rather, "[i]t must merely be reasonably competent." *Id.*

Counsel is also afforded significant discretion in selecting a trial strategy based on the information known at the time. *Yu Tian Li v. United States*, 648 F.3d 524, 528 (7th Cir. 2011). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Gilbreath*, 21 F.4th at 982. If the defendant wanted counsel to raise an argument that itself had no merit, an ineffective-assistance claim cannot succeed, because "[c]ounsel is not ineffective for failing to raise meritless claims." *Warren v. Baenen*, 712 F.3d 1090, 1104 (7th Cir. 2013); *see*

*also Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996) ("Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel.").

On the prejudice prong, the petitioner must show there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Gilbreath*, 21 F.4th at 981 (citation omitted). In assessing prejudice under *Strickland*, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel had acted differently." *Harrington*, 562 U.S. at 111. "The likelihood of a different result must be substantial, not just conceivable." *Id*. at 112.

Culotta had approximately 25 years of experience at the time of the trial and Shaw had approximately 15 years of criminal law experience. *Sheckles*, 2021 WL 2280972, at *3. The record reflects that they vigorously represented Sheckles prior to and during trial. Among other things, they conducted extensive pretrial discovery; moved for the appointment of ballistics and DNA experts; initiated independent testing of the physical evidence; filed and argued motions in limine; participated in jury selection; gave an opening statement; cross-examined the state's witnesses; twice moved for a mistrial arguing violations of the court's in limine rulings; moved for a directed verdict at the close of the state's case; actively participated in the jury instruction conference; objected during the state's closing argument; and gave a lengthy closing argument on

Sheckles' behalf. With this background in mind, the court turns to the specific errors asserted by Sheckles.

1.      Investigating Detective Kennedy

He first argues that his attorneys were deficient in not investigating Detective Kennedy. In November 2010, after Sheckles was charged but before he was tried, Detective Kennedy resigned from the Jeffersonville Police Department over allegations that "he had solicited sex acts in exchange for 'fixing' tickets and provided information to drug dealers." *Sheckles*, 2021 WL 2280972, at *3. In Sheckles' view, Detective Kennedy's involvement tainted the entire investigation and should have resulted in the exclusion of evidence or dismissal of the charge.

In rejecting his ineffective assistance claim related to Detective Kennedy on post-conviction review, the Indiana Court of Appeals properly identified *Strickland* as the governing standard. *Sheckles*, 2021 WL 2280972, at *4. The court concluded that he did not establish deficient performance or prejudice. *Id.* The court noted that his trial attorneys were well aware of the issue related to Detective Kennedy prior to trial but made a reasonable strategic decision not to pursue it. *Id.* at *4-5. The court further concluded that even if the attorneys were deficient, Sheckles did not establish prejudice because he presented no evidence of what an investigation would have revealed or how any alleged misconduct by Detective Kennedy "had any nexus to this case." *Id.* at *5.

This was not an unreasonable application of *Strickland* and is amply supported by the record. The evidence adduced in the post-conviction proceeding reflected that his attorneys were aware prior to trial that Detective Kennedy had resigned due to

11

alleged misconduct pertaining to ticket-fixing and leaking information to drug dealers. *Id.* The attorneys talked about this issue but knew that the prosecution did not intend to call Detective Kennedy as a witness at trial. *Id.* They thought it would be improper to call this witness solely for the purpose of impeaching him. *Id.* They also considered him to have a minor role in the investigation, and aside from the original tip provided by a confidential informant that Smith was involved in the offense, all of his involvement had occurred in the presence of other officers who had no apparent connection to his alleged workplace misconduct. *Id.* After further discussions, they concluded that they would not pursue this issue further and would instead focus their time and energy on other matters. As Shaw explained: "[W]ith everything going on with the judge and the continuances . . . we had to make a decision on which lines of evidence were the most fruitful to follow."[2] *Id.*

Other than pointing to Detective Kennedy's alleged unprofessional conduct, Sheckles does not provide any explanation of how it prejudiced him or even related to his case. Although Detective Kennedy was involved in investigating the case, his primary involvement was at the initial stage when he relayed the informant's tip that Smith had been involved in the crime. The anonymous tip was mentioned only briefly at trial as background about how investigators came to focus on Smith, which in turn led them to Sheckles. There were many other officers involved in the investigation, including officers from the Jeffersonville Police Department and the Indiana State

---

[2] Approximately a month before trial, defense counsel moved to continue the trial date , but the court denied this request. (DE # 11-3 at 56-59.)

Police, and there was no evidence these officers were connected in any way to any alleged wrongdoing by Detective Kennedy. Additionally, Detective Kennedy was not called as a witness for the prosecution at trial, and even if he had been, it is unlikely Sheckles' attorneys would have been permitted to ask him about acts of workplace misconduct that were not specifically related to Sheckles' case. *See* IND. R. EVID. 403, 404(b); *Caldwell v. State*, 43 N.E.3d 258, 264 (Ind. Ct. App. 2015).

The record thus reflects that Sheckles' attorneys were aware of Detective Kennedy's resignation and considered whether to investigate the matter further. They made a reasonable strategic decision that focusing on that issue was not likely to be helpful to the defense, and that their efforts were better spent on other matters in this complicated case. Sheckles has not demonstrated that they were deficient, or that the result of the proceeding likely would have been different if they had pursued this line of inquiry. The state court's rejection of this claim was not objectively unreasonable.

### 2.   Objecting to Closing Arguments

He next claims his attorneys were ineffective in failing to object to comments made by the prosecutor during closing arguments. The respondent argues that this claim is procedurally defaulted.

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Hoglund*, 959 F.3d at 832. The exhaustion requirement is premised on a recognition that the state courts must be given the first opportunity to address and correct violations of their prisoners' federal rights. *Davila v. Davis*, 582 U.S. 521, 528 (2017); *O'Sullivan v.*

13

*Boerckel*, 526 U.S. 838, 845 (1999). For that opportunity to be meaningful, the petitioner must fairly present his constitutional claim in one complete round of state review. *Baldwin v. Reese*, 541 U.S. 27, 30-31 (2004); *Boerckel*, 526 U.S. at 845. This includes seeking discretionary review in the state court of last resort. *Boerckel*, 526 U.S. at 848. The companion procedural default doctrine, also rooted in comity concerns, precludes a federal court from reaching the merits of a claim when the claim was presented to the state courts and was denied on the basis of an adequate and independent state procedural ground, or when the claim was not presented to the state courts and the time for doing so has passed. *Davila*, 528 U.S. at 528; *Coleman v. Thompson*, 501 U.S. 722, 735 (1991).

Sheckles asserted a claim on post-conviction review that his trial attorneys were ineffective in not objecting to comments made by the prosecutor during closing argument. However, the Indiana Court of Appeals concluded that this claim was waived because it was not raised in the trial court in accordance with state law. *Sheckles*, 2021 WL 2280972, at *3. The state court's finding of waiver means that the claim is defaulted in this proceeding. "[W]hen a state court refuses to reach the merits of a petitioner's federal claims because they were not raised in accord with the state's procedural rules . . . that decision rests on independent and adequate state law grounds," which bars federal review. *Kaczmarek v. Rednour*, 627 F.3d 586, 591 (7th Cir. 2010); *see also Bobo v. Kolb*, 969 F.2d 391, 399 (7th Cir. 1992) ("A federal court reviewing a habeas petition is required to respect a state court's finding, under state law, of waiver or procedural default.").

14

A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and resulting prejudice. *Davila*, 582 U.S. at 528. "Cause" in this context means "an objective factor external to the defense that impeded the presentation of the claim to the state courts." *Crutchfield v. Dennison*, 910 F.3d 968, 973 (7th Cir. 2018) (citation and internal quotation marks omitted). A habeas petitioner can also overcome a procedural default by establishing that the court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006).

Sheckles argues that the default was caused by the deficient performance of his post-conviction counsel. As a general rule, errors by post-conviction counsel do not qualify as cause to set aside a procedural default. *Maples v. Thomas*, 565 U.S. 266, 280 (2012). The Supreme Court has recognized an exception to this rule, wherein ineffective assistance by post-conviction counsel can provide cause to set aside the default of a claim of ineffective assistance by trial counsel. *Trevino v. Thaler*, 569 U.S. 413 (2013); *Martinez v. Ryan*, 566 U.S. 1 (2012). This so-called *Martinez-Trevino* exception applies to prisoners in Indiana. *Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017). To set aside a default under *Martinez-Trevino*, the petitioner must show that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say . . . that the claim has some merit." *Martinez,* 566 U.S. at 9, 14.

The court concludes that even if there is some threshold merit to this ineffective assistance claim such that the default should be set aside, it ultimately would not entitle him to federal habeas relief. Waiver aside, the Indiana Court of Appeals concluded that

15

Sheckles could not establish prejudice because his prosecutorial misconduct claim had been considered and rejected on the merits on direct appeal. *Sheckles*, 2021 WL 2280972, at *3. An ineffective-assistance claim cannot succeed where the underlying claim the petitioner wanted counsel to raise did not have merit. *See Warren*, 712 F.3d at 1104; *Stone*, 86 F.3d at 717. In other words, it would have been fruitless for post-conviction counsel to assert a claim in Sheckles' post-conviction petition that his trial attorneys should have objected to the prosecutor's comments, when the Indiana Court of Appeals had already concluded that the prosecutor's comments did not deprive him of a fair trial. He has not demonstrated an entitlement to habeas relief in connection with this claim even if the default could be set aside.

### 3.   Accomplice Liability Instructions

He next claims that his attorneys were ineffective in failing to object to a supplemental instruction on accomplice liability that was given in response to a question from the jury. (DE # 2 at 9.) The respondent argues that this claim is also procedurally defaulted. Although Sheckles presented this claim to the Indiana Court of Appeals on post-conviction review, he did not include it in his petition to transfer to the Indiana Supreme Court. (DE # 10-17.) Because he did not present this claim to the state court of last resort, it is defaulted. *Boerckel*, 526 U.S. at 848. Additionally, his default cannot be excused under *Martinez-Trevino*, because that exception does not apply to post-conviction appeals. *Martinez*, 566 U.S. at 16. Therefore, the claim cannot be considered on the merits.

16

    4.    <u>Requesting a Mistrial</u>

His final claim of ineffective assistance is that his attorneys should have demanded a mistrial when his cousin Robert engaged in misconduct on the witness stand. (DE # 2 at 11.) The respondent argues that this claim is also procedurally defaulted. The court agrees, as Sheckles did not include this claim in his petition to transfer on post-conviction review. (DE # 10-17.) The default cannot be excused under *Martinez-Trevino* because it occurred at the appeal level. *Martinez*, 566 U.S. at 16. For these reasons, claim one is denied.[3]

    *B.*    *Jury Instructions*

In claim two, Sheckles asserts a free-standing error with respect to the jury instructions. He argues that the Indiana Court of Appeals rendered a decision contrary to *Sandstrom v. Montana*, 442 U.S. 510 (1979), when it rejected his claim that the instructions on accomplice liability denied him a fair trial. The respondent argues that this claim fails on the merits.

Under Indiana law, "[a] person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense." IND. CODE § 35-41-2-4. Here, the jury was instructed as follows:

> A person who knowingly or intentionally aids, induces, or causes another person to commit an offense, commits that offense, even if the other person:
>
> (1) Has not been prosecuted for the offense;

---

[3] Sheckles also raises free-standing claims regarding the jury instructions, Robert's outburst, and prosecutorial misconduct. Those claims are addressed in detail below.

(2) Has not been convicted of the offense; or

(3) Has been acquitted of the offense.

A person is responsible for the actions of another person when, either before or during the commission of a crime, he knowingly aids, induces, or causes the other person to commit a crime. To aid is to knowingly support, help, or assist in the commission of a crime.

In order to be responsible for the actions of another, he need only have knowledge that he is helping in the commission of a crime and commit some act in furtherance of the crime. He does not have to personally participate in each element of the crime, nor does he have to be present when the crime is committed.

The presence of a person at the scene of a crime, failure to oppose the commission of a crime, companionship with the person committing the crime, and conduct before and after the crime may be considered by the jury in determining whether aiding may be inferred from the evidence presented.

There is no separate crime of being an accomplice or an accessory. There is no separate crime of aiding in the commission of a crime. One who knowingly aids another in the commission of a crime may be found guilty of that crime. It is not required for the State to charge in the Information that the defendant aided another. One who aids another to commit a crime may be charged with that crime, and tried and convicted as a principal.

(DE # 11-4 at 103.) The jury was further instructed: "Defendant's mere presence at the

scene is not enough to sustain a conviction on an accessory theory." (*Id.* at 104.)

The court also gave an instruction defining "knowingly and intentionally."

Specifically, the jury was instructed:

Knowledge or intent may be inferred from the facts and circumstances of the case and it is within the province of the jury to draw an inference of knowledge or intent from the facts presented.

A person engages in conduct "intentionally" if, when he engages in the conduct, it is his conscious objective to do so.

18

A person engages in conduct "knowingly" if, when he engages in the conduct, he is aware of high probability that he is doing so.

As long as you find that the Defendant acted knowingly or intentionally, there is no requirement that the State prove that the Defendant acted with planning or premeditation.

(*Id.* at 106.) The court sent multiple copies of the final instructions back with the jury to use during their deliberations. (DE # 11-9 at 3-4.)

During the second day of deliberations, the jury sent the judge a note stating: "[D]oes Ryan Sheckles need or have to have the gun in his hand to be guilty as stated in the charges, or according to Indiana state law is a person guilty if he participates? We are not lawyers and don't know how to interpret certain instructions." *Sheckles*, 2012 WL 1933082, at *5. After extensive discussions, the parties agreed to this brief additional instruction: "A person may be found guilty of murder if he commits, aids, induces or causes the murder." *Id.* On direct appeal, Sheckles argued that the additional instruction was erroneous because it failed to define what is meant by "participation" in a crime under Indiana law. *Id.* at *8. The Indiana Court of Appeals found that Sheckles had waived any error by agreeing to the additional instruction, and further, that any error was harmless in light of the other instructions given. *Id.* This decision was not contrary to *Sandstrom* or otherwise objectively unreasonable.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). This "bedrock" principle "prohibits the State from using evidentiary presumptions in a

jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." *Francis v. Franklin*, 471 U.S. 307, 313–15 (1985). In this context, the Supreme Court has distinguished between "mandatory presumptions" and "permissive inferences":

> The court must determine whether the challenged portion of the instruction creates a mandatory presumption, or merely a permissive inference. A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion.

*Id.* Mandatory presumptions violate Due Process if "they relieve the State of the burden of persuasion on an element of an offense." *Id.* Generally, "[a] permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved." *Id.* "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Id.* at 314-15.

Whether an instruction violates Due Process "requires careful attention to the words actually spoken to the jury, for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction." *Sandstrom*, 442 U.S. at 514. However, "the inquiry does not end there." *Francis*, 471 U.S. at 315. If a specific instruction "considered in isolation, could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an element of the offense, the potentially offending

20

words must be considered in the context of the charge as a whole." *Id.* "Other instructions might explain the particular infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitutional presumption." *Id.* Additionally, the court must consider that "[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might." *Boyde v. California*, 494 U.S. 370, 381 (1990). Rather, "[d]ifferences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." *Id.*

In *Sandstrom*, the jury was instructed that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." 442 U.S. at 512. Such an instruction was flawed because jurors "were not told that they had a choice, or that they might infer that conclusion; they were told only that the law presumed it." *Id.* This in turn improperly diluted the state's burden to prove all elements of the crime beyond a reasonable doubt and violated Due Process. *Id.* at 524.

The jury was given no such instruction here, nor was it given any instruction creating a mandatory presumption in favor of the state. *Sandstrom* is thus factually distinguishable. Other than pointing to *Sandstrom* and recounting the procedural history surrounding the additional instruction on accomplice liability, he does not develop an argument in his petition as to how the instructions given violated *Sandstrom*. (*See* DE # 2 at 13-14.) In his traverse, he suggests that the instruction was erroneous because it "lessen[ed] the burden of proof on the state." (DE # 27-2 at 7.) Although

unclear, he appears to be arguing that the instruction suggested he could be found guilty merely for being present when the offense was committed. (*Id.*)

The court disagrees. The jury was thoroughly instructed that the state bore the burden of proving him guilty beyond a reasonable doubt as to every element of the offense, and that this burden remained with the state throughout the trial. (DE # 11-4 at 100.) The jury was also instructed that it should consider all of the instructions together and should not "single out any certain sentence or any individual point or instruction and ignore the others. (*Id.* at 97.) It was instructed in detail on the requirements for proving accomplice liability under Indiana law, including that Sheckles must have had "knowledge that he [was] helping in the commission of the crime" and "commit[ted] some act in furtherance of the crime." (*Id.* at 103.) The jury was specifically instructed that "mere presence at the scene" was not enough to sustain a conviction under an accomplice liability theory. (*Id.* at 104.) The jury had access to all of these instructions during its deliberations. (DE # 11-9 at 3-4.)

The additional instruction on accomplice liability was not a complete statement of the law; it simply redirected the jury to the applicable legal standard. It was also accurate. Under Indiana law, a defendant can indeed be convicted of murder if he "commits, aids, induces or causes" the murder. IND. CODE § 35-41-2-4. "[T]here is no distinction between the responsibility of a principal and an accomplice. . . [and] one may be charged as a principal yet convicted on proof that he or she aided another in the commission of a crime." *Wise v. State*, 719 N.E.2d 1192, 1198 (Ind. 1999) (internal citations omitted). "If there is some evidence that a second party was involved in the

22

crime, an instruction on accomplice liability is proper." *Id.* Considering the instructions together, Sheckles has not demonstrated that the instructions lessened the burden on the state or otherwise contravened Supreme Court precedent.

Even if the court were to presume that the additional accomplice liability instruction was erroneous under federal law, Sheckles would not be entitled to habeas relief unless he could establish that the error resulted in "actual prejudice." *Armfield v. Nicklaus*, 985 F.3d 536, 543 (7th Cir. 2021). "Relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Id.* In this context, the court must review the entire record and determine "whether the ailing [jury] instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

The court concludes that this standard is not satisfied. There is strong evidence of Sheckles' guilt in the record: an eyewitness identified him as the shooter, there were phone records showing that the last calls made by one of the victims was to a phone connected to him, and another witness testified to his attempts to dispose of gun clips after the offense.[4] Additionally, his DNA was found on a cigarette recovered in close

---

[4] Sheckles argues that the eyewitness, Smith, was very confused in her testimony, sometimes interchanging "Ryan" for "Robert." Reviewing her testimony, there did not appear to be any genuine confusion in her mind as to what occurred. Instead, any confusion in her testimony appears attributable to the fact that she was not used to referring to these individuals as Ryan and Robert, and instead knew them by their nicknames, "BA" (or "Bad Ass") and "Harry." (*See* DE # 11-8 at 124.)

proximity to one of the victims. He has not established that an error in the jury instructions so infected the trial as to warrant federal habeas relief. This claim is denied.

C.     *Robert's Outburst*

In claim three, he argues that the Indiana Court of Appeals rendered a decision contrary to *Illinois v. Allen*, 397 U.S. 337 (1979), in rejecting his claim that his cousin Robert's outburst denied him a fair trial. (DE # 2 at 15.) The respondent argues that this claim is defaulted and alternatively fails on the merits.

The court agrees that this claim is procedurally defaulted. Although Sheckles presented this claim to the Indiana Court of Appeals on direct appeal, he did not include it in his petition to transfer to the Indiana Supreme Court. (DE # 10-10.) Because he did not present this claim to the state court of last resort, it is defaulted. *Boerckel*, 526 U.S. at 848. His default cannot be excused under *Martinez-Trevino*, because that exception only applies to defaulted claims of ineffective assistance of trial counsel, not to other types of defaulted claims. *Davila*, 582 U.S. at 529-30.

Even if the claim could be considered on the merits, it would not entitle him to federal habeas relief. The state court summarized the facts surrounding Robert's outburst as follows:

> [T]he State put Robert on the stand, believing that he would testify pursuant to a plea agreement and a grant of immunity. Robert took the stand and testified that he had a plea agreement and would testify truthfully. However, Robert unexpectedly refused to testify; and, with a myriad of profanities, declared that he would not testify, that he was forced to sign a statement, and that he did not recognize his plea agreement. Robert attempted to leave the courtroom several times before the trial court sent the jury out of the courtroom.

24

*Sheckles*, 2012 WL 1933082, at *11. Out of the presence of the jury, the prosecutor withdrew Robert's plea deal, which was contingent on him testifying, and he was discharged as a witness. The court then took a ten minute recess. After the recess, the court instructed the jury: "The prior witness Robert Sheckles has been discharged and won't be available for any further questioning by either side." The prosecution then proceeded to its next witness. (DE # 11-8 at 12-16.) Based on the record, the Indiana Court of Appeals found *Allen* inapplicable to this case and found no error in the trial court's handling of this witness. *Sheckles*, 2012 WL 1933082, at *11-12. This decision was not contrary to *Allen* or otherwise objectively unreasonable.

Sheckles believes that the trial court violated *Allen* when it failed to "remove the jury promptly upon the first sign of trouble" with Robert and when it failed to "admonish the jury" after this witness was removed. (DE # 2 at 15.) However, *Allen* governs how a trial court should handle an unruly *defendant*, and is premised on the accused's Sixth Amendment right to be present for his own trial. *Allen*, 397 U.S. at 344-45. *Allen* is not applicable to the handling of an unruly witness, nor was Sheckles excluded from his own trial.

The record reflects that the trial court reasonably handled this incident by trying to calm Robert down and determine whether he intended to testify pursuant to the agreement he had made with the prosecution. After it became clear he was not going to cooperate, the court quickly had the jury removed and then excused him as a witness. Sheckles did not request an admonishment at trial, nor does he provide any detail here

about how the jury should have been admonished.[5] The trial court wisely declined to draw undue attention to this issue, briefly informed the jury that Robert would not be testifying, and moved the case along. If anything, Robert's outburst and his refusal to testify were setbacks for the prosecution, not the defense. His statements on the stand (which the prosecution did not have an opportunity to challenge) suggested that the police had forced him to inculpate his cousin and that Sheckles did not commit the shooting. The state court's rejection of this claim was not objectively unreasonable and, therefore, the claim would not entitle him to habeas relief even if it was not defaulted.

    D.    *Cross-Examination of Smith*

In claim four, he argues that the Indiana Court of Appeals rendered a decision contrary to *Chambers v. Mississippi*, 410 U.S. 284 (1973), when it rejected his claim that his Confrontation Clause rights were violated when he was not permitted to cross-examine Smith about a prior arrest. (DE # 2 at 16.) The respondent argues that this claim is defaulted and also fails on the merits.

The court agrees that this claim is procedurally defaulted. Although Sheckles presented this claim to the Indiana Court of Appeals on direct appeal, he did not include it in his petition to transfer to the Indiana Supreme Court. (DE # 10-10.) Because he did not present this claim to the state court of last resort, it is defaulted. *Boerckel*, 526 U.S. at 848. His default cannot be excused under *Martinez-Trevino*, because that

---

[5] One of his trial attorneys testified at the post-conviction hearing that in her view, "more often than not it draws more attention" to a potentially damaging issue to have the trial court admonish the jury. *Sheckles*, 2021 WL 2280972, at *6.

exception only applies to defaulted claims of ineffective assistance of trial counsel, not to other types of defaulted claims. *Davila*, 582 U.S. at 529-30.

Even if the claim could be considered on the merits, it would not entitle him to federal habeas relief. The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. AMEND. VI. Under this Clause, a defendant has a right to "a fair opportunity to defend against the State's accusations." *Chambers*, 410 U.S. at 294. However, "this right does not permit a criminal defendant to admit any and all evidence" he chooses. *Hinkle v. Neal*, 51 F.4th 234, 241 (7th Cir. 2022). The Clause prohibits the exclusion of evidence pursuant to state evidentiary rules that "serve no legitimate purpose" or are "disproportionate to the ends [they are] asserted to promote." *Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006). Nevertheless, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Stock v. Rednour*, 621 F.3d 644, 649 (7th Cir. 2010) (cleaned up). Put simply, "it is only *unreasonable* limits that create Confrontation Clause problems." *Id.* (emphasis in original).

Here, the trial court excluded evidence regarding Smith's prior arrest for false informing, as this charge did not result in a conviction. This evidence was excluded under the Indiana Rules of Evidence, which prohibit the admission of a witness's criminal history offered as general impeachment "unless the criminal history consists of

certain crimes reduced to convictions." *Sheckles*, 2012 WL 1933082, at *12; *see also* IND. R. EVID. 404, 609. This evidence is vastly different from the excluded evidence in *Chambers*, which involved a third party's oral confession to the crime with which the defendant had been charged. *See Chambers*, 410 U.S. at 294. By contrast, evidence that Smith was arrested for an offense but not convicted had little probative value and was likely to confuse the jury. *See Michelson v. United States*, 335 U.S. 469, 482 (1948) ("Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty."); *Barber v. City of Chicago*, 725 F.3d 702, 709 (7th Cir. 2013) ("The well-established, general rule is that a witness's credibility may not be impeached by evidence of his or her prior arrests, accusations, or charges. This rule is based upon a clear recognition of the fact that the probative value of such evidence is so overwhelmingly outweighed by its inevitable tendency to inflame and prejudice the jury against the [party-witness] that total and complete exclusion is required in order that the right to trial by a fair and impartial jury may not be impaired." (citation omitted)).

Such evidence was also cumulative, as Sheckles' attorney was permitted to vigorously attack Smith's credibility in a lengthy cross-examination. Among other things, counsel elicited testimony that Smith was testifying pursuant to a plea deal, under which she would not be charged with any offense, even though she had run over one of the victims with her car. Counsel also elicited testimony that she spent three months in jail for failing to appear in accordance with a court order. (DE # 11-8 at 75-121.) The jury also heard evidence that this witness had a prior conviction for

28

shoplifting (or "conversion") and had charges pending against her for battery and possession of a controlled substance at the time of trial. *Sheckles*, 2012 WL 1933082, at *12. The jury was thus given ample reasons to view her testimony with skepticism, and evidence of an arrest that did not result in a conviction would have added little to the equation. The defense must be permitted to conduct a cross-examination of witness that allows the jury to "make an informed judgment as to the weight to place on [the witness's] testimony," and that occurred here. *Davis v. Alaska*, 415 U.S. 308, 317 (1974); *see also United States v. Clark*, 657 F.3d 578, 584 (7th Cir. 2011) ("If the defendant already has had a chance to impeach the witness's credibility and establish that she has a motive to lie, then any constitutional concerns vanish[.]").

Sheckles has not demonstrated that his Confrontation Clause rights were violated by exclusion of this evidence, or that the Indiana Court of Appeals rendered a decision that was contrary to Supreme Court precedent. This claim is denied.

E.     *Prosecutorial Misconduct*

In claim five, he argues that the Indiana Court of Appeals rendered a decision contrary to *United States v. Young*, 470 U.S. 1 (1985), when it rejected his prosecutorial misconduct claim. (DE # 2.) The respondent argues that this claim is procedurally defaulted and without merit.

The court agrees that this claim is procedurally defaulted. Sheckles asserted a claim of prosecutorial misconduct on direct appeal, but the Indiana Court of Appeals determined that the claim was waived because he did not object to the alleged misconduct at trial in accordance with state law. *Sheckles*, 2012 WL 1933082, at *9. The

state's court finding of waiver means that the claim is defaulted in this proceeding. *Kaczmarek*, 627 F.3d at 591; *Bobo*, 969 F.2d at 399.

Sheckles asserts a separate claim in his petition that his trial attorneys were ineffective in failing to object to the prosecutor's comments at trial, and attorney error amounting to ineffective assistance of counsel can supply cause and prejudice to excuse a default. *Davila*, 582 U.S. at 528. However, the exhaustion doctrine requires that an ineffective-assistance claim be presented to the state court as an independent claim before it may be used to establish cause for a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). As outlined above, Sheckles' ineffective assistance claim is itself defaulted. Although he asserted a claim on post-conviction review that his trial attorneys were ineffective in not objecting to comments made by the prosecutor, the Indiana Court of Appeals concluded that this claim was waived because it was not raised in the trial court in accordance with state law. *Sheckles*, 2021 WL 2280972, at *3. His claim of ineffective assistance therefore cannot supply cause to excuse his default.[6] *Dellinger v. Bowen*, 301 F.3d 758, 767 (7th Cir. 2002).

Even if the claim could be considered on the merits, it would not entitle him to federal habeas relief. On direct appeal, the Indiana Court of Appeals concluded that, waiver notwithstanding, the comments made by the prosecutor did not deny him a fair

---

[6] The default also cannot be excused under *Martinez-Trevino*, because that exception applies to errors made by post-conviction counsel, whereas here the alleged error was made by trial counsel. Additionally, *Martinez-Trevino* is a narrow exception that only applies to review of defaulted ineffective-assistance claims, not to a defaulted claim of prosecutorial misconduct. *See Davila*, 582 U.S. at 529.

trial. *Sheckles*, 2012 WL 1933082, at *10. This was not an unreasonable application of Supreme Court precedent.

"Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." *Young*, 470 U.S. at 11. Instead, "the relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainright*, 477 U.S. 168, 181 (1986). In making this determination the court should consider such factors as: "(1) whether the prosecutor misstated the evidence; (2) whether the remarks implicated specific rights of the accused; (3) whether the defense invited the response; (4) the trial court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut." *Ellison v. Acevedo*, 593 F.3d 625, 636 (7th Cir. 2010) (citation omitted).

Sheckles points to certain comments by the prosecutor that he finds objectionable: (1) the prosecutor's comment, "It's going to take courage from you to convict this man. Not because we didn't prove the case. This is a scary situation"; (2) his comments that defense attorneys will do "three things—confuse, conceal, and create," and, "You just saw an Academy award appearance of [defense counsel] showing you smoke and mirrors"; (3) his comment in relation to one of the victims, "Can you imagine something like this or anything [sic] happened to your children or grandchildren, your loved one. . . ."; and (4) his comments about Robert's conduct.  (DE # 2 at 18-20.)

31

These comments are materially different from the one at issue in *Young*, where the prosecutor gave his personal opinion about the defendant's guilt. The prosecutor did not do that here. Additionally, the comments Sheckles points to did not misstate the evidence or implicate a specific right of the accused. A prosecutor may not make an argument solely to inflame the passions of the jury, *United States v. Waldemer*, 50 F.3d 1379 (7th Cir. 1995), but the prosecutor's comment that the case was "scary" was a reasonable assessment of the evidence, given that Sheckles was accused of committing a cold-blooded double murder over a minor dispute. *Rodriguez v. Peters*, 63 F.3d 546, 565–66 (7th Cir. 1995) (habeas petitioner did not establish prosecutorial misconduct based on comments about vicious nature of the crime, where "the evidence at trial indeed revealed the offenses to be horrific"); *United States v. Tipton*, 964 F.2d 650, 656 (7th Cir. 1992) (comments were not improper where "prosecutor's remarks merely related to the inferences to be drawn from the evidence").

As to the comments about the defense, it is permissible for the prosecution to "criticize defense tactics, but not defense counsel." *United States v. Chavez*, 12 F.4th 716, 731 (7th Cir. 2021). The prosecutor walked a fine line in commenting directly about Sheckles' attorney, but understood in context, his comments appear geared more toward attacking the defense strategy rather than counsel herself. His comments were also invited, at least in part, by the defense. During the defense closing, counsel twice stated that Smith deserved an "academy award" for her tearful testimony on the stand, and accused her of bringing a "prop" (her handkerchief) to make her performance more convincing. (DE # 11-8 at 218, 226.) Counsel also pointed to various items in crime scene

photos and suggested that they may have had some connection to crime—and could have revealed the real culprit—but were never tested by police. Likewise, she discussed various individuals who were mentioned during the trial, suggesting that they may have had some involvement in the offense but were never brought in for questioning. She queried, "Don't you think that you deserve, don't you think that Larry and Shannon deserve more?" (*Id.* at 212.) During the state's rebuttal, the prosecutor borrowed defense counsel's "academy award" comment to suggest that the defense was merely attempting to distract the jury from the inculpatory evidence with supposition. *United States v. Reed*, 2 F.3d 1441, 1450 (7th Cir. 1993) ("It is not only permissible but advisable in closing argument to refute meritless accusations."). Notably, he also tempered his criticism of counsel by commenting that Sheckles' attorneys had "done an excellent job with what they've got." (DE # 11-8 at 240.)

He also objected to comments made during the state's rebuttal argument in reference to Shannon Morrow. During the defense closing, Sheckles' attorney referenced the fact that Shannon made it back into the house and managed to call 911, but her call kept getting "rerouted and rerouted and rerouted," during which time she was essentially bleeding to death. (DE # 11-8 at 233.) Counsel further stated, "You heard the 911 tape and it was terrible and if there is nothing you get out of this trial, be an advocate for fixing the 911 system because that was inexcusable." (*Id.*) During the state's rebuttal, the prosecutor described how Shannon made her way back to the house after being shot. He further stated:

> She calls, and this one I have to agree with [defense counsel] can you imagine something like this or anything happened to your children or your grandchildren, your loved one and you get sent to Louisville and they don't know who you are or where you are, and the clock's ticking, she's packing three rounds with exit wounds.

(DE # 11-8 at 249.) This statement was somewhat inartful, but he appears to be referencing the fact—raised by defense counsel—that Shannon's 911 call was mishandled. The tangential issue of the 911 call did not implicate any right of Sheckles, nor did it misstate the evidence or even relate to the evidence of guilt.

Finally, he objects to the prosecutor's comments about Robert, because he believes the prosecutor implied that he had "hidden information about Robert Sheckles' knowledge that inculpated Ryan." (DE # 2 at 20.) The prosecutor's comments about Robert did not hint that he had any "hidden" information. Instead he stated that jurors "saw Robert Sheckles on the stand" and noted that he did not provide any testimony that was helpful to Sheckles. (DE # 11-8 at 194.) The prosecutor did not misstate the evidence or implicate a right of the accused. As stated above, Robert's conduct in effect aided Sheckles, because he refused to provide inculpatory testimony notwithstanding his prior agreement with the prosecution, and he suggested to the jury that Sheckles had been framed. Because he was discharged as a witness, the state had no opportunity to challenge his statements through cross-examination. The defense had the opportunity to rebut any comments made by prosecutor about Robert during the defense closing, but did not do so. Instead, counsel also highlighted Robert's behavior on the stand, stating, "You saw how volatile he is." She also referred to Smith and

34

Robert as "Bonnie and Clyde," and argued that Smith was pinning the murders on Sheckles to protect her former boyfriend. (*Id.* at 202.)

Even assuming the prosecutor's comments were improper, they cannot be said to have denied him a fair trial. *See Young*, 470 U.S. at 11 ("the prosecutor's statements, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice"). The comments Sheckles objects to were brief and were made in the context of a lengthy argument and rebuttal that focused on the state's evidence. The jurors were instructed that they were "the exclusive judges of the evidence, the credibility of the witnesses and of the weight to be given to the testimony of each of them." (DE # 11-4 at 117.) There was substantial evidence of Sheckles' guilt presented to the jury, including the testimony of Smith, phone records, the DNA evidence, and testimony about his efforts to hide evidence after the shooting. Even if this claim was not defaulted, it would not entitle him to federal habeas relief.

F.     *Certificate of Appealability*

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, the court must either issue or deny a certificate of appealability in all cases where it enters a final order adverse to the petitioner. To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473,

484 (2000) (internal quotation marks and citation omitted). For the reasons fully explained above, Sheckles' claims are procedurally defaulted or without merit under AEDPA standards. The court finds no basis to conclude that reasonable jurists would debate the outcome of the petition or find a reason to encourage Sheckles to proceed further. Accordingly, the court declines to issue him a certificate of appealability.

### III.   CONCLUSION

For the reasons set forth above, the petition (DE # 2) is **DENIED**, and the petitioner is **DENIED** a certificate of appealability. The Clerk is **DIRECTED** to close this case.

**SO ORDERED.**

Date: November 6, 2023

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT